**Affirm and Opinion Filed August 29, 2023**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-21-00965-CV

**GALOVELHO LLC, Appellant**
**V.**
**GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; COLLIN COUNTY, TEXAS; AND CITY OF FRISCO, TEXAS, Appellees**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-02595-2020**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Goldstein, and Rosenberg[1]
Opinion by Justice Pedersen, III

Galovelho, LLC appeals the trial court's September 21, 2021 Order and Final Judgment, which dismissed all of Galovelho's claims with prejudice after granting appellees' original and supplemental pleas to the jurisdiction. In seven issues, Galovelho challenges the trial court's jurisdictional rulings on its claims for takings and for equitable relief and the trial court's earlier order requiring leave of court

---

[1] The Hon. Barbara Rosenberg, Justice, Assigned.

before Galovelho further amended its pleadings. We affirm the trial court's Order and Final Judgment.

## BACKGROUND

In the Spring of 2020, when the Covid-19 virus spread throughout the State of Texas, appellant Galovelho was operating EG Steak, a dine-in full-service restaurant in Frisco, Texas. On March 13, 2020, due to the imminent threat posed by Covid-19, appellee Governor Greg Abbott declared a state of disaster pursuant to the Texas Disaster Act. Days later, on March 19, Abbott issued executive order GA-08, which in relevant part stated:

> In accordance with the Guidelines from the President and the CDC, people shall avoid eating or drinking at bars, restaurants, and food courts, . . . provided, however, that the use of drive-thru, pickup, or delivery options is allowed and highly encouraged throughout the limited duration of this executive order.

GA-08. During the course of the disaster declaration, Abbott issued a series of additional executive orders that permitted indoor dining in varying percentages of a restaurant's capacity. None of these orders required restaurants to close; none prohibited owners from using their property.

In similar fashion, on March 16, 2020, Collin County Judge Chris Hill issued a proclamation after the Commissioner's Court declared a state of disaster in Collin County. The county issued its own executive order, *inter alia*, incorporating Abbott's GA-08 and stating that "persons shall avoid eating or drinking at bars, restaurants, and food courts . . . However, the use of drive-thru, pickup, or delivery

options for bars, restaurants, and food courts is allowed and highly encouraged throughout the limited duration of [Abbott's] Executive Order." Second Executive Order.

And in March 2020, the City of Frisco likewise issued its Declaration of Local Disaster for Public Health Emergency. Frisco passed an ordinance stating, "In accordance with the Guidelines from the President, the Governor and the CDC, people shall avoid eating or drinking at bars [and] restaurants." Ordinance No. 2020-03-12. That provision was clarified to add: "Restaurants and beverage bars with or without drive in or drive-through services . . . may only provide take out, delivery or drive-through services as allowed by law." Ordinance No. 2020-03-13.

We will collectively describe these state, county, and municipal limitations on restaurants, which began in March 2020 and extended to varying degrees for approximately one year, as the Emergency Orders.

On May 22, 2020, Galovelho filed suit against Abbott, Collin County, and Frisco. He alleged that the Emergency Orders had effected a taking of its property, and he sought $2 million in damages. In June 2020, all three defendants filed pleas to the jurisdiction alleging that the court lacked subject matter jurisdiction over the takings claims. Galovelho filed an omnibus response, clarifying that its claims for regulatory takings should be analyzed as categorical takings under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992), or alternatively, as traditional takings pursuant to *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978).

Following a hearing, the trial court granted all three pleas to the jurisdiction. Galovelho perfected an interlocutory appeal of those orders.

However, the day after filing its omnibus response, Galovelho also filed its Second Amended Petition, which added allegations that the Emergency Orders were "invalid because they are unconstitutional and illegal under Texas Law." The pleading alleged equitable claims based on the Emergency Orders, including claims for both injunctive and declaratory relief. Galovelho pleaded that he was denied due process rights to notice and a hearing before the Emergency Orders took effect and that restaurants were being denied equal protection of the law without a rational basis for the deprivation. He prayed that appellees be permanently enjoined from enforcing the provisions of the Emergency Orders and that the court enter judgment declaring the various Emergency Orders unconstitutional and invalid.

On August 14, 2020, the trial court issued an order purporting to support resolution of jurisdictional issues in an efficient manner. The order required Galovelho to seek leave of court before further amending its pleadings. Shortly after, Galovelho's interlocutory appeal was voluntarily dismissed and remanded to the trial court. *Galovelho, LLC v. Abbott*, No. 05-20-00784-CV, 2020 WL 6156014 (Tex. App.—Dallas Oct. 21, 2020, no pet.).

On March 2, 2021, Abbott issued an order stating that "there are no Covid-19-related operating limits for any business or other establishment [in Texas]." GA-

–4–

34.[2] Shortly after, appellees filed their joint Supplemental Plea to the Jurisdiction, arguing that the trial court lacked jurisdiction over Galovelho's equitable claims because the claims had become moot following GA-34. Appellees also argued that Galovelho lacked standing for a number of its claims and that some claims were barred by sovereign immunity. Galovelho responded, and after hearing, the trial court granted the supplemental plea and dismissed all of Galovelho's claims with prejudice.

This appeal followed.[3]

## THE TRIAL COURT'S JURISDICTIONAL RULINGS

Whether a court has subject matter jurisdiction is a question of law. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A court's lack of subject matter jurisdiction is properly asserted in a plea to the jurisdiction. *Id.* at 225–26. In this case, the trial court concluded that it lacked subject matter jurisdiction to decide Galovelho's claims on a number of grounds. The court concluded broadly that Galovelho's claims were barred by sovereign or governmental immunity and that it lacked standing to bring suit against appellees. The court concluded specifically that Galovelho did not have a viable takings claim under the Texas

---

[2] Collin County's final order limiting occupancy expired on April 30th of 2020. Frisco continued adopting ordinances that, in turn, adopted the Governor's executive orders and expired by their own terms. Thus, when GA-34 issued, no county or municipal orders continued to limit restaurant operations.

[3] In response to Galovelho's request, we briefly abated the appeal so the trial court could make findings of fact and conclusions of law.

constitution. And finally, the court concluded that Galovelho's due process and equal protection claims for equitable relief were moot. We review the trial court's rulings on these pleas to the jurisdiction de novo. *See Miranda*, 133 S.W.3d at 226 ("Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed *de novo*.").[4]

### *Galovelho's Takings Claims*

In its Original and First Amended Petitions, Galovelho pleaded that the Emergency Orders effected an unlawful taking of its property under the Texas constitution. The fundamental rule of article I, section 17 prevents the government's taking, damaging, or destroying a person's property for public use without either the consent of the person or adequate compensation's being made. TEX. CONST. art. I, § 17(a).[5] This clause is self-executing and waives any claim of immunity by governmental actors, whether sovereign or governmental, when a takings claim is properly pled. *See City of Dallas v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2012)

---

[4] We recognize that some pleas to the jurisdiction raise issues of jurisdictional fact that must be decided by a fact-finder. *Miranda*, 133 S.W.3d at 226. Galovelho's briefing identifies no such fact issue that is necessary to resolution of the pleas in this case on the grounds discussed below.

[5] The provision makes exceptions, not at issue in this case, if the taking is for:

    (1) the ownership, use, and enjoyment of the property, notwithstanding an incidental use, by:

        (A) the State, a political subdivision of the State, or the public at large; or

        (B) an entity granted the power of eminent domain under law; or

    (2) the elimination of urban blight on a particular parcel of property.

*Id.* at § 17(a). Although Galovelho's early pleadings included reference to section 19 in its takings pleading, its arguments in this Court are limited to section 17 in support of the takings claims, while it relies on section 19 in support of its equitable claims, discussed below.

(clause is self-executing); *see also Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012) ("In the absence of a properly pled takings claim, the state retains immunity."). We review the trial court's grant of a plea to the jurisdiction to determine "whether the plaintiff's pleadings, construed in favor of the plaintiff, allege sufficient facts affirmatively demonstrating the court's jurisdiction to hear the case." *Hearts Bluff Game Ranch, Inc.*, 381 S.W.3d at 476.

Galovelho pled two types of regulatory takings claims against the appellees: a categorical taking pursuant to *Lucas*, 505 U.S. at 1019 and a traditional taking pursuant to *Penn Central*, 438 U.S. at 124.

### The Lucas *Takings Claim*

Galovelho's first claim alleged a categorical or per se taking, which occurs "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle." *Lucas,* 505 U.S. at 1019 (emphasis in original). The Supreme Court identified this categorical taking claim in *Lucas*, but limited it to "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.* at 1017 (emphasis in original). The *Lucas* Court's use of emphasis underscores that a categorical taking occurs only when the government's action destroys all economic value of the property at issue.[6] That principle was

---

[6] In a more recent discussion of the *Lucas* rule, the Supreme Court stated that "[t]he emphasis on the word "no" in the text of the [*Lucas*] opinion was, in effect, reiterated in a footnote explaining that the

subsequently confirmed, when the Court wrote that "[a]nything less than a 'complete elimination of value,' or a 'total loss'" would prevent such a taking claim. *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 330.

Galovelho pleaded: "The economic impact of the regulations was total and failed to allow any economic or beneficial use of the property as a full-service restaurant." But the *Lucas* requirement of a "complete elimination of value" or a "total loss" is not tied to an owner's preferred economic use of the property. Galovelho does not dispute that restaurants were always permitted to operate under the Emergency Orders, albeit in a limited capacity. Customers could always take food out or have it delivered. And for significant amounts of the affected time period, restaurants were permitted to operate as "full-service dine-in restaurants"—to use Galovelho's description—with limited levels of occupancy on site. Moreover, all of the regulations on the restaurant industry were temporary, which means an owner's economic loss could not be complete. *See id.* at 332 ("Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted."). We conclude that Galovelho's complaints cannot meet the requirements of a categorical taking because the Emergency Orders never completely destroyed all economic value of its property.

---

categorical rule would not apply if the diminution in value were 95% instead of 100%." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (citing *Lucas*, 505 U.S. at 1019, n. 8).

## *The* Penn Central *Takings Claim*

Galovelho also pleaded a taking pursuant to the Supreme Court's analysis in *Penn Central*. There, the Supreme Court stated that whether a particular property restriction is a taking depends largely "upon the particular circumstances [in that] case." *Id.* at 124. But the Court identified three guiding factors for our consideration in this context: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with the economic expectations of the property owner; and (3) the character of the governmental action. *Id.* at 124.

One of our sister courts has recently applied these *Penn Central* factors to a group of bars complaining of emergency orders during the Covid-19 pandemic and alleging a taking; we find that court's analysis persuasive. *See Stand for Something Grp. Live, LLC v. Abbott*, No. 13-21-00017-CV, 2022 WL 11485464 (Tex. App.—Corpus Christi–Edinburg Oct. 20, 2022, pet. denied) (mem. op.).

First, we agree that the economic impact of the Emergency Orders weighs against finding a taking. *See id.* at *7. This factor "merely compares the value that has been taken from the property with the value that remains in the property." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 936 (Tex. 1998). We do not ordinarily consider the loss of anticipated gains or potential profits in this consideration. *See id.* Galovelho's brief is replete with charges that the Emergency Orders "damaged" its property, but it nowhere addresses a comparison of the value of the restaurant before and after the pendency of the Emergency Orders. Galovelho

did not plead facts indicating that the economic impact of the Emergency Orders so interfered with its property rights that the appellees had appropriated the property from him. *See City of Baytown v. Schrock*, 645 S.W.3d 174, 181 (Tex. 2022). We cannot conclude that the value of Galovelho's property was greatly diminished by the temporary restrictions placed by those orders. *See Stand for Something Grp. Live*, 2022 WL 11485464 at *7.

Although Galovelho's property was never deprived completely of its economic value, we conclude that the second *Penn Central* factor weighs in Galovelho's favor, i.e., in favor of finding a taking. *See id.* Galovelho's primary investment-backed expectation for the property was to operate a full-service dine-in restaurant at its full capacity. According to Galovelho's pleading, that expectation complied with its lease, its certificate of occupancy, and its history of operation. We do not question that the Emergency Orders interfered temporarily with Galovelho's expectations for its business. *See id.*

However, we agree with our sister court that the third *Penn Central* factor weighs heavily against finding a taking in this case. *See id.* at *8. The character of the governmental action in this case is nothing like a physical invasion. *See Penn Central*, 438 U.S. at 124. The Emergency Orders must be viewed in the context of the existing national public health emergency, during which "restrictions were issued to combat 'the imminent threat of disaster' posed by COVID–19, a contagious and deadly virus." *See Stand for Something Grp. Live*, 2022 WL 11485464 at *8.

Galovelho argues that the government's motive for the regulation at issue is irrelevant, relying on *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). In that opinion, the Supreme Court re-considered its suggestion in earlier cases that whether a government regulation "substantially advanced" a valid public purpose could serve as a stand-alone test for a takings claim. *Id.* at 540 (explaining that "substantially advances" language has been read to announce stand-alone regulatory takings test "wholly independent of *Penn Central* or any other test"). The Court rejected this stand-alone test, saying:

> [T]he "substantially advances" inquiry probes the regulation's underlying validity. But such an inquiry is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose.

*Id.* at 543. Rather than the purpose of the regulation, then, we are to focus upon a challenged regulation's effect on private property. *Id.* Importantly, though, the *Lingle* Court did not equate the government's motive with the character of the regulation. Instead, it reaffirmed use of that third *Penn Central* factor to determine "whether [the regulation] amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Id.* at 539.

When we look at the particular circumstances in this case, as *Penn Central* directs us to do, we agree that the Emergency Orders "are hallmark examples of regulations that 'adjust[ ] the benefits and burdens of economic life to promote the common good.'" *Stand for Something Grp. Live*, 2022 WL 11485464 at *8 (quoting *Penn Central*, 438 U.S. at 124) (also citing *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168–69 (1958) (concluding that government orders temporarily shutting down gold mines during war time were not a regulatory taking in light of the "temporary restriction[ ]," wartime demands on resources, and the fact that the shutdown was "essential to the war effort"); *Mugler v. Kansas*, 123 U.S. 623, 668, (1887) ("[P]rohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking.")). We conclude that the *Penn Central* factors do not support a conclusion that Galovelho pled a valid regulatory taking in this case.

*Galovelho's Argument That the Law Has Changed*

Despite its initial reliance on *Lucas* and *Penn Central*, Galovelho now argues that its takings claim is not dependent upon meeting those standards. It contends that takings law has changed and it need only plead and prove some "damage" to its property to obtain compensation from the government. Indeed, Galovelho argues that the legal inquiry for the existence of a taking now amounts to a single question: Was the property damaged by the actions of appellees? This argument is based on

two legal theories: (1) the Texas constitution provides more protection for a landowner than the U.S. Constitution, and (2) the United States Supreme Court has recently ruled that protection for constitutional rights is much broader than our earlier jurisprudence accorded. We address these theories briefly in turn.

(1) The Texas Constitution

There is no dispute that the Texas constitution's takings provision is different from the United States Constitution's provision. The Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation," while the Texas counterpart provides: "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation." U.S. CONST. amend. V; TEX. CONST. art. I, § 17(a).

Our supreme court recognized that distinction more than forty years ago. *See Steele v. City of Houston*, 603 S.W.2d 786 (Tex. 1980). The *Steele* court stated that the three bases for compensation in the Texas constitution, although "often treated, more or less, as synonyms," are actually "different and have different historical origins." *Id.* at 789. The court went on to state:

> It is not every damaging, however, that should be compensated. The Constitution limits compensation to damages "for or applied to public use," and judicial restraints have narrowed that phrase to damages which arise out of or as an incident to some kind of public work.

*Id.* at 790. In *Steele*, the plaintiffs alleged a claim under article I, section 17 when officers of the Houston Police Department caused the destruction of their home and belongings while attempting to recapture three escaped convicts who had taken

–13–

refuge in the house. *Id.* at 788. The court concluded that the plaintiffs could state such a claim if they could prove that the City, acting through its authorized officers, intentionally set the house on fire (or prevented the fire's extinguishment after it was set) and "that the destruction was done 'for or applied to public use.'" *Id.* at 791–92. The court went on to instruct that the City could defend against this claim "by proof of a great public necessity. Mere convenience will not suffice. Uncompensated destruction of property has been occasionally justified by reason of war, riot, pestilence or other great public calamity." *Id.* at 792.

Galovelho does not attempt to fit its claim within the *Steele* understanding of a compensable claim for damage of property short of an actual taking. Instead, relying largely on two recent concurring opinions by supreme court justices, he simply equates the damages he alleges from temporary restrictions to an actual taking. We do not read either of the concurring opinions to make that same equation. *See Schrock*, 645 S.W.3d 182–88 (J. Young concurring); *Jim Olive Photography v. Univ. of Houston Sys.*, 624 S.W.3d 764, 777–82 (Tex. 2021) (J. Busby concurring). And each of the majority opinions in those cases addresses the taking alleged under established federal jurisprudence. *See Schrock*, 645 S.W.3d at 181 (applying *Penn Central* factors); *Jim Olive Photography*, 624 S.W.3d at 771-74 (applying *Lucas* progeny to takings claim).

Neither of these cases—in majority or concurring opinions—supports Galovelho's argument that any damage to property is compensable under the Texas constitution. Indeed, the majority in *Jim Olive Photography* states specifically:

> A compensable taking does not arise whenever state action adversely affects private property interests. Governments interfere with private property rights every day. Some of those intrusions are compensable; most are not.

624 S.W.3d at 771. That opinion continues to affirm that "Texas case law on takings under the Texas Constitution is consistent with federal jurisprudence." *Id.* Like the Texas Supreme Court, we acknowledge that the language in the Texas and federal takings provisions is different. But we await that court's directive that the provisions are to be analyzed differently when a takings claim is made for property temporarily "damaged."

(2)   *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)

Finally, Galovelho argues that the Supreme Court's opinion in *Bruen* has markedly changed the test we must use to evaluate any government regulation of a constitutional right. In that case, the Court addressed New York's regulation of its citizens' Second Amendment rights and stated that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. Therefore, according to the Court:

> To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude

that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961)).

Galovelho argues that this *Bruen* test now applies to any government regulation of a constitutional right. Because the Texas constitution purportedly protects against the type of conduct he challenges, Galovelho contends that appellees "must demonstrate there is a valid, constitutional, and historical basis for their actions." We reject Galovelho's argument that the *Bruen* test is applicable in any context other than the Second Amendment. But regardless, appellees have in fact established that they had a valid constitutional and historical basis for the Emergency Orders. *See*, *e.g.*, *Steele*, 603 S.W.2d at 792 ("Uncompensated destruction of property has been occasionally justified by reason of war, riot, pestilence or other great public calamity.").

***

The trial court correctly concluded that Galovelho failed to plead a compensable claim for a taking. Accordingly, those claims for monetary relief remain barred by appellees' sovereign and governmental immunity.[7] We overrule Galovelho's second issue.

---

[7] In its seventh issue, Galovelho argues dramatically that we must "[l]et sovereign immunity die; kill it if you have to." The United States Supreme Court has stated, "Although the sovereign immunity of the States derives at least in part from the common-law tradition, the structure and history of the Constitution make clear that the immunity exists today by constitutional design." *Alden v. Maine*, 527 U.S. 706, 733 (1999). We cannot disregard such settled law; we overrule the seventh issue without further discussion.

### *Galovelho's Equitable Claims*

In its Second Amended Petition, Galovelho brought claims for injunctive and declaratory relief based on constitutional challenges to the Emergency Orders. The trial court concluded that these claims were moot and dismissed them. Texas courts lack jurisdiction to issue advisory opinions, i.e., opinions that decide an abstract question of law without binding the parties. *Abbott v. Mexican Am. Legislative Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 689 (Tex. 2022) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993); TEX. CONST. art. II § 1). "A case becomes moot if, since the time of filing, there has ceased to exist a justiciable controversy between the parties—that is, if the issues presented are no longer 'live,' or if the parties lack a legally cognizable interest in the outcome." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012). If a court's action on the merits of a case cannot affect the parties' rights or interests, then the case is moot, and courts are without jurisdiction to decide it. *Id.* We review an application of the mootness doctrine de novo. *Matthews, on behalf of M.M. v. Kountze Indep. Sch. Dist.*, 484 S.W.3d 416, 418 (Tex. 2016).

### *Injunctive Relief*

Galovelho sought injunctive relief in the trial court based on its claims that appellees' actions violated its rights to equal protection and due process under the Texas constitution. *See* TEX. CONST. art I, §§ 3, 19. In its third appellate issue,

Galovelho argues that these equitable claims are ripe and are not barred by any jurisdictional issues.

Galovelho's equal protection claim alleged that the Emergency Orders "determin[ed] which people, businesses, services, and groups are permitted to operate their business, and who must shut down their business on the whim of Government," and identified no "discernable, legitimate, criteria that has any rational relationship to the governmental interest of stopping the spread of Covid-19." Its due process claim asserted that "[n]o local government or state government has ever provided notice of deprivation, notice of hearing, a hearing, or any meaningful review of the actions of the state and local government." Galovelho sought injunctive relief from the purportedly unconstitutional effects of the Emergency Orders.

Appellees argue that these equitable claims have been mooted by subsequent government orders. GA-34 provided that "there are no Covid-19-related operating limits for any business or other establishment." Similarly, all Collin County limitations on restaurants were rescinded, and all Frisco ordinances have expired. There are no longer any limitations on indoor dining in Texas. Thus, the regulations that were allegedly harming Galovelho no longer exist.

Galovelho does not dispute the fact that the restrictions on restaurant operations that he complained of no longer exist. However, he relies on exceptions to the mootness doctrine for matters that are capable of repetition but evading review

and for matters voluntarily abandoned by the defendant. We disagree that either exception should apply in this case.

The mootness exception for an issue "capable of repetition, yet evading review" applies only in rare circumstances. *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001). A plaintiff invoking this exception must establish that: (1) the challenged action was too short in duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation exists that the same complaining party will be subjected to the same action again. *Id.* We acknowledge that no one can predict with certainty that a world-wide pandemic will never again occur and cause restrictions on the public like those that were in place temporarily in Texas. But we have held that a mere theoretical possibility that a party may be subjected to the same action again is insufficient to satisfy the test. *City of Dallas v. Woodfield*, 305 S.W.3d 412, 419 (Tex. App.—Dallas 2010, no pet.). Despite the fact that Covid-19 has not disappeared completely, none of the appellees has ordered similar restrictions for more than two years. Like our sister court, "[W]e see that as a powerful signal that whatever course the Covid–19 pandemic takes, a return to restrictions like those challenged here is highly unlikely." *Stand for Something Group Live, LLC*, 2022 WL 11485464, at *4 (citing *Eden, LLC v. Justice*, 36 F.4th 166, 171 (4th Cir. 2022)).

Galovelho also relies on mootness cases that express a concern when charged conduct is voluntarily ceased by the defendant without an admission that the action

was wrongful. The concern is that "defendants could control the jurisdiction of courts with protestations of repentance and reform, while remaining free to return to their old ways." *Matthews, on behalf of M.M.*, 484 S.W.3d at 418. In a voluntary cessation case, dismissal is appropriate only when subsequent events make clear that the challenged conduct could not reasonably be expected to recur. *Id.* Again, no court can predict the future. But we can conclude that, based on the passage of more than two years without imposition of any further restrictions on restaurants, it is not reasonable to expect appellees to issue restrictions comparable to those issued at the height of the pandemic. Here, the complained-of conduct was voluntarily ceased as the dangers of Covid-19 were mitigated through vaccination and immunity gained after infection. Subsequent events do not support a concern that appellees will "return to their old ways." *See id.*

We conclude that no live controversy exists based on Galovelho's claims for injunctive relief. It sought through these claims to be free of the limitations placed by the Emergency Orders; it has been freed by the rescission and expiration of those orders. We conclude the trial court correctly determined that Galovelho's injunctive claims were moot and should be dismissed. We overrule its third issue.

*Declaratory Relief*

Galovelho's Second Amended Petition also sought a judgment declaring that "the challenged Executive Orders and local orders violate the Texas Disaster Relief Act and are unconstitutional." In its fourth appellate issue, Galovelho argues that

this claim is also ripe and that the trial court had jurisdiction over it. Again, we disagree.

Galovelho argues that "the only way a claim to the constitutionality of a statue, or actions thereunder, could be rendered moot is by some other declaration determining the statute or actions thereunder unconstitutional." It cites cases dealing largely with a plaintiff's complaint about the defendant's interpretation of a statute or application of a policy. *See, e.g.*, *Lakey v. Taylor ex rel. Shearer*, 278 S.W.3d 6, 9 (Tex. App.—Austin 2008, no pet.) (dispute over Texas Department of State Health Services' policy and practice regarding providing competency-restoration treatment to persons found incompetent to stand trial); *Tex. Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841, 844 (Tex. App.—Austin 2002, pet. denied) (dispute over amount of civil penalty permitted for HMO's failure to file annual Health Plan Employer Data Information Set report). These cases address the situation where a defendant abandons its position on the statutory interpretation or application of a policy and then contends the plaintiff's claim is moot; the reviewing courts conclude that the parties' same dispute could arise again if the government reasserts its interpretation or policy. *See Lakey*, 278 S.W.3d at 12; *Tex. Health Care Info. Council*, 94 S.W.3d at 847--48.

Galovelho's declaratory claim differs substantively from those cases on which he relies. Its claim does not challenge a government department's policy that can be changed or reasserted based on changes in the department's funding. *See Lakey*, 278

–21–

S.W.3d at 9. Nor does it challenge a government administrative decision concerning penalties available by statute for violation of a reporting obligation. *See Tex. Health Care Info. Council*, 94 S.W.3d at 844. Those decisions were made by bureau-level groups, and they affected a single entity (the non-reporting HMO) or a discrete group with whose care the bureau was charged (persons found incompetent to stand trial). The Emergency Orders were issued by the highest executive authorities of the State of Texas, Collin County, and the City of Frisco. They were a response to the dangers faced by our entire population in the midst of a worldwide pandemic. We concluded above that the passage of time and the mitigation of those dangers indicated that we can reasonably assume similar orders will not be issued again.

Galovelho no longer faces the purportedly unconstitutional conduct about which it complains; any prospective declaratory relief we might grant cannot help it. *See Williams*, 52 S.W.3d at 184. Deciding Galovelho's declaratory judgment claim would yield no more than an advisory opinion. The claim is moot. We overrule Galovelho's fourth issue.

### *Relief Beyond That Requested*

In its fifth issue, Galovelho argues that the trial court granted relief to Collin County and Frisco beyond what those parties requested and briefed. Specifically, Galovelho contends that neither Collin County nor Frisco raised arguments below concerning standing or immunity to Galovelho's equitable claims. Galovelho acknowledges that all appellees raised issues of immunity in their pleas challenging

its takings claims. In addition, Galovelho concedes that all appellees asserted mootness in regard to the equitable claims. We have affirmed the trial court's takings ruling based on Galovelho's failure to plead a claim that effectively waives appellees' immunity. And we have affirmed the trial court's conclusion that Galovelho's equitable claims are moot. Thus, both the trial court's conclusions and our own are based on jurisdictional arguments unquestionably raised and briefed by all parties. We overrule Galovelho's fifth issue.[8]

### The Trial Court's Pleading-Amendment Order

In its sixth issue, Galovelho complains of the trial court's "preemptive and prophylactic ban" on its ability to amend its pleading. It argues that the trial court's August 14, 2020 order violates the open courts provision of the Texas constitution and that it prevented Galovelho's ability to update its responses to changes in the Emergency Orders.

The court's order recited that Galovelho had filed three petitions between May 22, 2020 and August 12, 2000. It recited further that appellees had all asserted immunity to Galovelho's claims, filed Pleas to the Jurisdiction, and advised the court

---

[8] Because Galovelho raises a standing question in this issue, we note here that the Texas Supreme Court has recently confirmed that "[j]ust one valid jurisdictional obstacle is enough for the court to halt further proceedings." *Rattray v. City of Brownsville*, 662 S.W.3d 860, 868 (Tex. 2023) ("The fundamental rule is that the court may not reach the merits if it finds a single valid basis to defeat jurisdiction. When one such ground exists, it is not necessary that *every other* potential jurisdictional defect be raised, fleshed out, or resolved at the outset."). Because we have determined that the trial court lacked jurisdiction on other bases, we need not address Galovelho's first issue involving its standing to bring the claims it did.

that they would file supplemental briefing to address the new claims alleged in Galovelho's Second Amended Petition. The order continued:

> The Court is mindful that issues of jurisdiction and immunity should be determined as soon as practicable. Thus, in order to foster judicial economy, afford [appellees] their right to swift determination of jurisdictional immunity issues, and minimize costs and delays to all of the parties, the Court **ORDERS** that [Galovelho] shall not file any further amended pleadings without written leave of this Court. The Court will consider the Plaintiff's Second Amended Petition to be the live pleading for jurisdictional immunity challenges and will address same at a subsequent hearing based on further briefing and argument.

Contrary to Galovelho's characterization, this order does not ban its ability to amend its pleadings. Instead, it requires only that it seek leave of court before it amends them. And while Galovelho contends that its complaints about this limitation "fell on deaf ears and the trial court refused to rescind its unconstitutional order," the record contains no attempt by Galovelho to seek leave to amend, let alone any refusal to grant that leave.

The trial court was well within its discretion to order matters in the litigation so that jurisdictional issues could be settled as soon as practicable. The Texas Supreme Court has declared its "adher[ence] to the fundamental precept that a court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided." *Miranda*, 133 S.W.3d at 228.

The trial court's order made the jurisdictional resolution a priority, while allowing Galovelho to request leave to amend its pleadings if it wished to do so. By

failing to seek leave to amend, Galovelho has failed to preserve error for our review.

We overrule Galovelho's sixth issue.

**CONCLUSION**

We affirm the trial court's September 21, 2021 Order and Final Judgment.

210965f.p05

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE

–25–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GALOVELHO LLC, Appellant

No. 05-21-00965-CV      V.

GREG ABBOTT, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF
THE STATE OF TEXAS; COLLIN
COUNTY, TEXAS, AND CITY OF
FRISCO, TEXAS, Appellees

On Appeal from the 219th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 219-02595-
2020.
Opinion delivered by Justice
Pedersen, III. Justices Goldstein and
Rosenberg participating.

In accordance with this Court's opinion of this date, the September 21, 2021 Order and Final Judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Greg Abbott, in his official capacity as Governor of the State of Texas; Collin County, Texas, and the City of Frisco, Texas recover their costs of this appeal from appellant Galovelho LLC.

Judgment entered this 29th day of August, 2023.